UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANDREW SMART,                                          :

                          Petitioner,          :        **MEMORANDUM DECISION**

              - v -                                    :        17-CV-5140 (DC)

JAMIE LAMANNA,                                         :

                          Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


APPEARANCES:            ANDREW SMART
                        Petitioner *Pro Se*
                        DIN 12-A-5165
                        Sing Sing Correctional Facility
                        Ossining, NY  10562

                        ERIC GONZALEZ, Esq.
                        Kings County District Attorney
                        By:    Leonard Joblove, Esq.
                               Jill Oziemblewski, Esq.
                               Assistant District Attorneys
                        350 Jay Street
                        Brooklyn, NY  11201-2908
                               Attorney for Respondent

CHIN, Circuit Judge:

                In 2012, following a jury trial, petitioner Andrew Smart was convicted in

the Supreme Court of the State of New York, Kings County (Chun, *J.*), of two counts of

murder in the first degree, one count of attempted murder in the second degree, and

two counts of criminal possession of a weapon in the second degree. Dkt. 9 at 8. On November 7, 2012, Smart was sentenced to, *inter alia*, concurrent prison terms of life without parole. *Id*. His convictions were affirmed by the Appellate Division, Second Department, with one justice dissenting. *People v. Smart*, 36 N.Y.S.3d 197 (2d Dep't 2016) ("*Smart I*"). The dissenting justice granted Smart leave to appeal to the New York Court of Appeals. *People v. Smart*, 74 N.E.3d 688 (N.Y. 2017) ("*Smart II*"). The Court of Appeals affirmed, by memorandum, the Appellate Division's order. *People v. Smart*, 81 N.E.3d 379 (N.Y. 2017) ("*Smart III*").

In 2017, proceeding *pro se*, Smart filed this habeas petition (the "Petition") pursuant to 28 U.S.C. § 2254. Dkt. 1. The Kings County District Attorney's Office filed its opposition on December 12, 2017. Dkt. 9. Smart filed a traverse on February 5, 2018. Dkt. 13. The case was reassigned to the undersigned on February 3, 2023. Dkt. Sheet at 4.

For the reasons that follow, the Petition is DENIED.

## STATEMENT OF THE CASE

### A.    *The Facts[1]*

The evidence at trial established the following:

---

[1]    The facts are drawn from the Respondent's affirmation in opposition to the Petition as well as the People's brief to the Second Department in opposition to Smart's appeal; both contain detailed recitations of the facts, supported by citations to the record, including the testimony of the witnesses. *See* Dkt. 9 at 3-8; Dkt. 11-1 at 43-70.

On September 10, 2009, at approximately 5 p.m., twenty-year old Antoine Stokes and two fifteen-year-olds, S.H. and D.H., were sitting on the stoop of a residential building on Bainbridge Street in Brooklyn.  Smart, Raneiro Chavez, and Maurice Hall walked up to Stokes and the two fifteen-year-olds, and asked if they were "Chaun City."  D.H. said no but S.H. said yes.  Within seconds, Smart, Chavez, and Hall pulled out guns and repeatedly fired at the young men on the steps, from about six feet away.  Stokes was struck by bullets six times, S.H. was struck with four bullets, and both died from the gunshot wounds.  D.H. was hit once and sustained serious injuries, eventually requiring the removal of his kidney and spleen.  Dkt. 9 at 1-2; *see also* Dkt. 9-3 at 108-09; Dkt. 11-1 at 43, 52-54, 56-59, 60-63.

At trial, D.H. -- the surviving victim -- described the shooting.  After he was shot, he saw the three shooters run away and heard Stokes call for his mother.  He identified Smart in a lineup in 2011 and in court at trial.   Dkt. 9-3 at 103-11; *see also* Dkt. 9 at 4-5 (noting that D.H. identified Smart as "the guy that was shooting").

Laverne Benn, who was sitting on her stoop on Bainbridge Street, saw the three boys walk by and approach the other boys on the stoop.  Then, "they automatically started shooting, pow, pow, pow and stuff."  Dkt. 9-4 at 60.  At first she was looking the other way, but when she heard the first shots she turned her head and saw them shooting; she saw the "flashes" as the guns were fired.  *Id.* at 63.  Benn identified Smart in a lineup in 2011 as well as in court at trial.  Dkt. 11-1 at 59-61, 67-68;

3

*see also* Dkt. 9 at 6 (noting that at lineup, Benn identified Smart as "one of the shooters" and as "the guy closest to her during the shooting").

Willie Spears knew Smart (as "Drew" from the neighborhood) as well as Chavez and Hall. On September 10, 2009, at the Marcy Houses, either Smart or Chavez asked him for a ride. Borrowing his mother's Trail Blazer, Spears drove Smart, Chavez, and Hall to Bainbridge Street and Patchen Avenue, where the three got out of the car. Smart told Spears they would be right back and to "wait up the block." Dkt. 9-4 at 147. Spears drove a block away and waited. Spears then heard gunshots coming from behind him. He jumped and turned around and saw Smart, Chavez, and Hall running towards his car. Spears did not see who fired the shots and he did not see anyone with a gun. But Smart, Chavez, and Hall jumped into the car and Hall told Spears to "take off" and "keep going." Spears drove off, and "[took] a couple of lights" as he was told. *Id.* at 149. Smart, Chavez, and Hall jumped out of the car when they got back to Marcy Houses. Spears did not see the three again that night and he avoided them thereafter. Dkt. 11-1 at 62-64. Suzette Scarborough, who had been walking up Bainbridge Street, saw a grey sports utility vehicle ("SUV") speed down Bainbridge Street. *Id*. at 54; *see also id*. at 64 (describing video of grey SUV traveling on Bainbridge Street).

On April 22, 2011, after he had been arrested on unrelated charges, Smart was placed in a lineup. Both D.H. and Benn identified Smart as one of the shooters. *Id.* at 66-67. Chavez and Hall were also eventually arrested. Dkt. 9 at 2.

4

**B.**     *Procedural History*

**1.**     *State Court Proceedings*

**a.**     *The Trial Court Proceedings*

In 2011, Smart and Chavez were charged in Supreme Court, Kings

County, with two counts of murder in the first degree, two counts of murder in the

second degree, one count of attempted murder in the second degree, and two counts of

criminal possession of a weapon in the second degree.  Hall was not arrested until 2012,

but he was charged then with the same crimes.  Dkt. 9 at 2.

In 2012, Smart made a *pro se* motion for a change of assigned counsel.  On

May 25, 2012, the trial court (Firetog, *J.*) resolved the motion, declining to replace

counsel but instructing counsel to provide discovery materials to Smart, even if in

piecemeal fashion, and to arrange for interviews.  Counsel reported on his efforts to

meet and otherwise communicate with Smart.  Dkt. 9-1 at 7-8.

In September 2012, the court (Chun, *J.*) conducted a suppression hearing,

pursuant to *United States v. Wade*, 388 U.S. 218 (1967).  *See* Dkt. 9-1 at 12.  The

investigating detectives described, *inter alia*, their interviews of Benn and D.H.  Benn

first identified Smart in a photo array shown to her on September 10, 2009, the day after

the shooting, but she asked to see him in person to be sure.  On December 2, 2009, while

he was in the hospital, D.H. was shown a photo array that included Smart but he did

not recognize anyone.  In April 2011, after Smart had been arrested in an unrelated case,

5

the detectives arranged for an in-person lineup that included Smart.  Both D.H. and

Benn identified Smart from the lineup as one of the shooters.  Dkt. 9 at 3-6.

On September 19, 2012, ruling from the bench, the court denied the

motion to suppress the identification evidence.  Dkt. 9 at 7.  The court acknowledged

some physical differences between Smart and the fillers, but concluded that Smart did

not "stick out" and that the lineup was not "unduly suggestive."  Dkt. 9-1 at 267-68.

Trial commenced on September 20, 2012.  Dkt. 9-2 at 2.  Two juries were

empaneled, with one jury (designated the blue jury) hearing the case against Smart and

Chavez and a second jury (designated the orange jury) hearing the case against Hall.

Dkt. 9 at 7.  The People called the eyewitnesses discussed above, including, *inter alia*,

D.H., Benn, Spears, and Scarborough, as well as law enforcement officers who testified

about the investigation and medical personnel who testified about the victims' injuries.

On October 16, 2012, the blue jury returned a verdict convicting Smart of

two counts of murder in the first degree, one count of attempted murder in the second

degree, and two counts of criminal possession of a weapon.  *Id*. at 8.[2]

On November 7, 2012, Smart was sentenced principally to concurrent

prison terms of life without parole for each of the murder convictions, twenty years for

---

[2]      The blue jury convicted Chavez of the same charges.  The orange jury was unable to
reach a unanimous verdict as to Hall and a mistrial was declared.  After a second trial, Hall was
convicted of two counts of first-degree murder, one count of second-degree attempted murder,
and one count of second-degree criminal possession of a weapon.  Dkt. 9 at 8 & n. 2.

the attempted murder conviction, and five years for each of the weapon possession

convictions. *Id.* Before imposing sentence, the trial court stated as follows:

> As far as the criminal conduct goes, this was the most senseless, heinous
> killing that anyone can imagine.  The defendants sprayed bullets -- over 20
> of them -- into the stoop where three people were seated.  They were shot
> multiple times for no good apparent reason.  The two people were killed[,]
> died not knowing what was happening, why they were being shot.

Dkt. 10-2 at 10-11.

### b.      *The Appellate Proceedings*

Represented by counsel, Smart appealed to the Appellate Division, Second

Department.  He raised four claims:  (1) in basing its case on "problematic witnesses,"

the prosecution failed to prove Smart's guilt beyond a reasonable doubt and therefore

the verdict was against the weight of the evidence; (2) the trial court deprived Smart of

due process and his right to counsel by failing to respond properly to Smart's *pro se*

motion for new counsel; (3) two key witnesses were subjected to suggestive lineups;

and (4) his sentence should be reduced to a term that gave him an opportunity for

parole. Dkt. 9 at 9; Dkt.11-1 at 3.

On August 3, 2016, by a vote of 3-to-1, the Appellate Division affirmed the

convictions and sentence.  *See Smart I,* 36 N.Y.S.3d at 197.  The court rejected the claim

that Smart's right to counsel was violated, as Smart "failed to make the requisite specific

factual allegations of 'serious complaints about counsel'" and "[i]n any event, the trial

court made a sufficient inquiry into [Smart]'s criticisms of assigned counsel." *Id.* at 197-

98 (cleaned up).  The court also concluded that the trial court "properly denied" the motion to suppress lineup identification evidence, holding that "the lineup fillers possessed physical characteristics which were reasonably similar to those of the defendant, and that the police took reasonable steps to conceal any differences between the appearances of the lineup fillers and the defendant." *Id*. at 198.  The court further held that "the evidence was legally sufficient to prove the defendant's guilt beyond a reasonable doubt," and that, based on its "independent review," "we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id*.  Finally, the court concluded that "[t]he sentence imposed was not excessive." *Id*.

Justice Cheryl E. Chambers dissented with respect to the identification evidence, writing that:

> When age is considered along with other factors, such as skin tone, height, and the presence of a distinctive tattoo on the defendant's neck (which was plainly visible when one of the witnesses asked each of the lineup participants to step close to the one-way mirror), the lineup, in my view, was unduly suggestive.

*Id*. at 199.

Smart's appellate counsel applied to Justice Chambers for a certificate granting leave to appeal to the Court of Appeals.  In his leave application, Smart focused on the lineup evidence but requested review of all the issues raised in his brief to the Appellate Division.  Dkt. 9 at 10; Dkt. 11-2 at 2-7.  By order dated January 6, 2017, Justice Chambers granted the application.  *Smart II*, 74 N.E.3d at 688.

8

On June 29, 2017, the Court of Appeals affirmed the conviction.  In its memorandum, the court wrote that "[t]he record supports the Appellate Division's finding that the challenged lineup was not unduly suggestive.  Accordingly, defendant's claim is beyond our further review."  *Smart III*, 81 N.E.3d at 379.[3]  The court did not address the other issues raised before the Appellate Division.  *Id*.

### 2.    *Proceedings Below*

Smart filed the Petition *pro se*, raising the same claims he raised before the Appellate Division.  Dkt. 1 at 18-24; Dkt. 9 at 12.  The Kings County District Attorney's Office filed its opposition on December 12, 2017, Dkt. 9 at 12, and Smart filed a traverse on February 5, 2018.  Dkt. 13.  Smart wrote to the Court on January 18, 2022 and November 7, 2022, inquiring as to the status of the Petition.  Dkt. 16, 17.

The case was reassigned to the undersigned on February 3, 2023.

### *DISCUSSION*

### A.    *Federal Review of State Convictions*

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3]    No judge dissented; Judge Feinman did not participate in the case.  81 N.E.3d at 379.

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857

F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state

court's decision must be accorded "substantial deference."  *Fischer v. Smith*, 780 F.3d 556,

560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was

'so lacking in justification that there was . . . [no] possibility for fairminded

disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting

*Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012).

## II.     *Analysis*

Smart raises four claims.  As the Appellate Division did, I address the

claims in the following order: (1) the denial of his request for new appointed counsel;

(2) the purported suggestiveness of the lineup identifications; (3) the sufficiency of the

evidence; and (4) the sentence.

### A.     *The Request for New Counsel*

In the second ground of the Petition, Smart argues that the trial court

deprived him of due process and right to counsel "by failing to respond properly to his

motion for reassignment of counsel."  Dkt. 1 at 20.  Smart moved for new appointed

counsel long before trial and alleges that "[t]here is no record, however, that the court

ever entered or ruled on that motion."  *Id.*

10

An indigent defendant has a right to counsel under both the federal and state constitutions, "but this entitlement does not encompass the right to counsel of one's own choosing. While a court has a duty to investigate complaints concerning counsel, 'this is far from suggesting that an indigent's request that a court assign new counsel is to be granted casually.' Whether counsel is substituted is within the 'discretion and responsibility' of the trial judge." *People v. Porto*, 942 N.E.2d 283, 287 (N.Y. 2010) (internal citations omitted). New assigned counsel will be appointed "upon a showing of good cause, such as a conflict of interest or other irreconcilable conflict with counsel." *People v. Ward*, 994 N.Y.S.2d 675, 677 (2d Dep't 2014).

Even assuming this claim is not procedurally barred, as Respondent contends, Dkt. 9 at 36-38, the claim provides no basis for habeas relief. First, Smart is mistaken, for the trial court did address his request for new assigned counsel. The transcript of the proceedings on May 25, 2012 shows that the court addressed Smart's request for new counsel. The court considered Smart's concerns, instructed counsel to take certain actions, and continued counsel's representation of Smart. Dkt. 9-1 at 6-8.

Second, the Appellate Division reviewed the claim on the merits, and concluded that the trial court denied the motion for substitution of counsel only after making "sufficient inquiry into the defendant's criticisms of assigned counsel, and thereupon provided a satisfactory solution to address his concerns." *Smart I*, 36 N.Y.S.3d at 198 (citations omitted). The Appellate Division's determinations that the

11

trial court made a "sufficient inquiry" and "provided a satisfactory solution to address [Smart's] concerns" are entitled to deference and were, in any event, reasonable.

Hence, this claim provides no basis for federal habeas relief.

## B.     *The Identifications*

In the third ground of the Petition, Smart argues that "[t]wo key witnesses were subjected to suggestive lineups," referring to Benn and D.H.  Dkt. 1 at 21-23.

"The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures."  *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir. 1994). First, the court must determine whether the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968); *accord Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001).  To determine the reliability of an in-court identification, the court looks to the totality of the circumstances, *United States v. Tortora*, 30 F.3d 334, 338 (2d Cir. 1994), and may consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation," *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  Due process is violated when, under the totality of the circumstances, the identification procedure was "so impermissibly suggestive as to

12

give rise to a very substantial likelihood of irreparable misidentification." *Jarrett v. Headley*, 802 F.2d 34, 40-41 (2d Cir. 1986) (quoting *Simmons*, 390 U.S. at 384). If the pretrial identification procedure was not suggestive, the identification evidence presents no due process obstacle to admissibility, and no further inquiry by the court is required. *Raheem*, 257 F.3d at 133 (citing *Jarrett*, 802 F.2d at 42)

Second, if the court concludes that the pretrial procedure was indeed unduly suggestive, in-court identification testimony may nonetheless be admitted if the court determines it to be "independently reliable." *Id*. To determine the independent reliability of an in-court identification, the court considers the factors set forth above. *See Manson*, 432 U.S. at 114; *see also Neil v. Biggers*, 409 U.S. 188, 199 (1972). There is no requirement that all these factors weigh in the prosecution's favor; rather, they are to be assessed in light of the "totality of the circumstances." *Neil*, 409 U.S. at 199. When the in-court identification is independently reliable, then the admission of the identification testimony does not violate due process. *Dunnigan v. Keane*, 137 F.3d 117, 128-29 (2d Cir. 1998), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012).

Here, both the Appellate Division and the Court of Appeals addressed this claim on the merits. The Appellate Division reviewed the photograph of the lineup and concluded that "the lineup fillers possessed physical characteristics which were reasonably similar to those of the defendant, and that the police took reasonable steps to conceal any differences between the appearances of the lineup fillers and [Smart]."

13

*Smart I,* 36 N.Y.S.3d at 198; *see* Dkt. 10-4 at 2 (lineup photograph).  The court considered

and rejected Smart's other arguments as to suggestiveness.  *See Smart I,* 36 N.Y.S.3d at

198.  The Court of Appeals held that "[t]he record supports the Appellate Division's

finding that the challenged lineup was not unduly suggestive."  *Smart III,* 81 N.E.3d at

379.  And at the *Wade* hearing, the trial court went through the facts carefully,

addressing the purported differences in physical characteristics and concluding that

Smart did not "stick out" and that the lineup was not "unduly suggestive."  Dkt. 9-1 at

267-68.

These factual findings of the state courts are entitled to deference and they

are not, in any event, unreasonable, as the lineup photograph demonstrates.  *See* Dkt.

10-4 at 2.  Nor are the decisions of the state courts here contrary to or an unreasonable

application of clearly established federal law.  At step one, the lineup was not so

suggestive as to raise a substantial likelihood of irreparable misidentification.  And at

step two, even assuming there was some risk of misidentification, the testimony of the

two witnesses was reliable in light of all the circumstances.  Accordingly, this claim

fails.

### C.    *The Sufficiency of the Evidence*

The first ground of the Petition raises what is essentially a sufficiency

argument, as Smart contends that the prosecution failed to prove that he was one of the

14

three gunmen beyond a reasonable doubt and that the verdict was against the weight of the evidence.

When considering a sufficiency argument on habeas review, "[a] federal court must look to state law to determine the elements of the crime." *Fama v. Comm'r Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted). A federal court "must consider whether, as a matter of federal law, there was sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law." *Einaugler v. Supreme Court of New York*, 109 F.3d 836, 839 (2d Cir. 1997) (citations omitted). The reviewing court "must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor." *Fama*, 235 F.2d at 811 (citation omitted). A "petitioner bears a very heavy burden in convincing a federal *habeas* court to grant a petition on the grounds of insufficiency of the evidence." *Id*. (citation omitted). Indeed, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

Even assuming this claim is not procedurally barred, as Respondent argues, Dkt. 9 at 28-33, the claim fails. The Appellate Division considered the claim on the merits and held that "the evidence was legally sufficient to prove the defendant's

15

guilt beyond a reasonable doubt." *Smart II*, 36 N.Y.S.3d at 198 (citation omitted).   The

Appellate Division conducted an "independent review" of the record and concluded

that "we are satisfied that the verdict of guilt was not against the weight of the

evidence." *Id.*  The Appellate Division's decision must be accorded "substantial

deference." *Fischer*, 780 F.3d at 560.

        The Appellate Division's rejection of the sufficiency argument was

certainly reasonable, as there was more than enough evidence -- including the

testimony of one of the victims and other eyewitnesses, videotapes, and medical

findings -- for the jury to conclude beyond a reasonable doubt that Smart and two

others shot the three victims, killing two of them and seriously injuring the third.  Benn

watched as Smart and his codefendants walked right by her stoop, approached the

three victims, and shot them.  D.H. was sitting on the stoop just a few feet from the

three assailants as they shot him and the other two victims.  And Spears, who knew the

three assailants from the neighborhood, drove them to and from the scene of the crime.

This compelling evidence was sufficient to support the jury's determination that Smart

was one of the three shooters and guilty of the charged crimes, and, thus, this claim

provides no basis for federal habeas relief.

    **D.**    *The Sentence*

        In his final claim, Smart contends that his "sentence should be reduced to

a term that gives him an opportunity for parole."  Dkt. 1 at 23.  The claim is really an

argument that his sentence should have been reduced as a discretionary matter on account of mitigating factors, including his minimal criminal record at the time (only two misdemeanors), earning his GED after dropping out of school in the twelfth grade, and working at a museum for a year.  *Id.*[4]  The Appellate Division considered the claim on the merits and rejected it, concluding that "[t]he sentence imposed was not excessive."  *Smart I*, 36 N.Y.S.3d at 198.  The Court of Appeals did not address the sentencing issue.  *See Smart III*, 81 N.E.3d at 379; *see also People v. Thompson*, 458 N.E.2d 1228, 1231 (N.Y. 1983) ("It is well settled that any question as to whether an otherwise lawful sentence is harsh or severe . . . involves a type of discretion not reviewable by the Court of Appeals."); *People v. Miles*, 459 N.E.2d 1286, 1286 (N.Y. 1983) (holding that Appellate Division's decision not to grant defendant discretionary relief with respect to sentence is not reviewable by Court of Appeals).

        "No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Fielding v. LeFevre*, 548 F.2d 1102, 1108 (2d Cir. 1977) ("Essentially, [defendant] asks this Court to review a sentence handed down by a state court, which we are powerless to do.").

---

[4]        At sentencing defense counsel noted that Smart was "the father of I believe three young children."  Dkt. 10-2 at 8.

Smart was convicted of two counts of first-degree murder in violation of New York Penal Law § 125.27(1)(a)(viii), *see* Dkt. 1 at 1, a Class A-1 felony, *see* N.Y. Penal Law § 125.27 ("Murder in the first degree is a class A-I felony."). A defendant convicted of a class A-1 felony under New York law may be sentenced to life imprisonment without parole. *See* N.Y. Penal Law § 70(2)(a), (3)(a)(i), (5) ("A defendant may be sentenced to life imprisonment without parole upon conviction for the crime of murder in the first degree as defined in section 125.27 of this chapter and in accordance with the procedures provided by law for imposing a sentence for such crime."). Hence, Smart's sentence of life imprisonment without parole was within the range permitted by New York law, and no federal constitutional issue is presented. *See Moreno v. Kirkpatrick*, No. 06-CV-2136 (DLI), 2010 WL 1223121, at *6 (E.D.N.Y Mar. 23, 2010) (imposition of sentence of life imprisonment without parole was not subject to federal habeas review where it was "explicitly within the statutory range for the crime" of conviction).

Finally, given that Smart's conduct involved the cold-blooded shooting of three young men sitting on a stoop -- in the trial court's words, "the most senseless, heinous killing that anyone can imagine," Dkt. 10-2 at 10 -- the imposition of the maximum sentence permitted by law was not unreasonable.

18

*CONCLUSION*

Smart has failed to show a basis for relief under 28 U.S.C. § 2254.

Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of

appealability because Smart has not made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), I certify

that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this

case.  The Clerk shall also mail copies of this memorandum decision and the judgment

to Smart at his last known address.

SO ORDERED.

Dated:       New York, New York
             April 11, 2023

DENNY CHIN
United States Circuit Judge
Sitting By Designation

19